IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY DOCKERY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 09-732 |
| | ) | |
| | ) | Judge Terrence F. McVerry/ |
| CAPTAIN LEGGET; CAPTAIN RISKUS; | ) | Magistrate Judge Maureen P. Kelly |
| LIEUTENANT LESURE; SERGEANT | ) | |
| BERTO; SERGEANT BITTNER; | ) | |
| JOHNSON, Correctional Officer; | ) | |
| GRIFFIN, Correctional Officer; | ) | |
| COLLINS, Correctional Officer; DOBIS, | ) | [ECF Nos. 147, 152, 164] |
| Correctional Officer; RICKET, | ) | |
| Correctional Officer; JENNINGS, | ) | |
| Correctional Officer; ANKRON, | ) | |
| Correctional Officer; VOJACEK, | ) | |
| Correctional Officer; CHRIS MYERS, | ) | |
| Physician Assistant; NURSE TONY; | ) | |
| D.P. BURNS, former Deputy | ) | |
| Superintendent; POPOVICH, Unit | ) | |
| Manager; BUSH, Sergeant, | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

I.      RECOMMENDATION

Timothy Dockery ("Plaintiff" or "Dockery") is a state prisoner in the custody of the

Pennsylvania Department of Corrections ("DOC"), serving four consecutive life sentences after

convictions for second-degree murder, burglary and conspiracy, following the murder of three

men and a young woman while avenging a fistfight. See, Dockery v. McCullough, 2003 WL

23142181 (No. 02-cv-4000) (E.D. Pa. Aug. 29, 2003).[1] Dockery's convictions were affirmed

both on appeal and after at least three petitions for collateral relief filed pursuant to the

---

[1] The Court takes judicial notice of Dockery's criminal trial court docket available at:
http://ujsportal.pacourts.us/docketsheets/CourtSummaryReport.aspx?matterID=103351891.

Pennsylvania Post Conviction Relief Act, 42 Pa. C.S. § 9541, *et. seq.* ("PCRA"), as well as a petition for writ of habeas corpus. Id.

Since his incarceration, Dockery has been convicted of several additional offenses related to the possession of weapons or implements for escape, attempted escape and criminal conspiracy. See, n.1, *supra.* Further, as of November 10, 2008, Dockery was disciplined nearly 85 times for DOC misconduct offenses ranging from assaults on inmates and guards, threatening employees and refusing to obey orders. [ECF No. 152-9, 152-7, p. 20]. Throughout his incarceration, Dockery has proven to be dangerous, recalcitrant and litigious, this action marking his eighth filing in the federal court system with at least one additional prisoner civil rights action filed in Pennsylvania state courts. See, generally, PACER; Dockery v. Cameron, 1545 WDA 2011 (Pa. Super. 2011).

Dockery initiated this civil rights suit against Defendants, all of whom worked at either the State Correctional Institution at Forest ("SCI-Forest") or the State Correctional Institution at Fayette ("SCI-Fayette"). Dockery alleges that his First, Eighth and Fourteenth Amendment rights were violated during the period 2007 through 2009, while confined at SCI-Forest and SCI-Fayette. In particular, Dockery alleges that various Defendants have fabricated false misconduct reports against him, improperly confiscated his property, retaliated against him for filing grievances, wrongfully debited his inmate account for the shipping of his typewriter for repair, improperly debited his inmate account for medical co-pays arising out of a hunger strike, wrongfully used excessive force against him when he refused to enter his cell and/or relinquish handcuffs, wrongfully placed him on "behavior modified meals" for assaulting or attempting to assault staff members, and wrongfully placing him in either disciplinary, administrative or secure special needs housing without due process of law.

Discovery is complete and the parties have filed Motions for Summary Judgment, extensive briefs and exhibits in support and opposition thereto. [ECF Nos. 147, 152 and 164]. As more fully explained below, the evidence adduced to date establishes that there are no genuine issues of material fact and that Defendants are entitled to the entry of judgment in their favor as a matter of law. Accordingly, it is respectfully submitted that Dockery's Motions for Summary Judgment [ECF Nos. 147, 164] be denied and Defendants' Motion for Summary Judgment [ECF No. 152] be granted.

## II. REPORT

### A. PROCEDURAL BACKGROUND

Dockery was granted leave to file this pro se action *in forma pauperis* in June, 2009. His Complaint [ECF No. 5] and Amended Complaint [ECF No. 17] allege a litany of claims against thirty Defendants who were employed by or under contract with the DOC. As a result of previous rulings of this Court granting Motions to Dismiss and Motions for Summary Judgment, seventeen Defendants remain.[2] [ECF Nos. 99, 100, 120]. In his remaining claims, Dockery alleges that Defendants have participated in various violations of his constitutional rights in retaliation for the filing of grievances against various DOC employees. Defendants' current Motion for Summary Judgment is on behalf of all remaining Defendants.

### B. RELEVANT FACTUAL BACKGROUND

#### 1. Alleged Retaliation for June 2007 Complaints by Plaintiff's Sister

Dockery first complains that in early June 2007, his sister wrote to DOC officials complaining about SCI-Forest corrections officers arriving at work at intoxicated. [ECF Nos. 5,

---

[2] Claims remain against Defendants Leggett, Riskus, Lesure, Berto, Bittner, Ankron, Collins, Dobis, Griffen, Jennings, Johnson, Rickets, Vojacek, Tony, Burns, Bush and Popovich. [ECF No. 148, p.2]. Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment omits Defendant Collins from the list of Defendants against whom claims remain, but the Court, in an abundance of caution, assumes this was an oversight. [ECF No. 165, p. 2].

p. 5; 149-5, pp. 40-41, ECF No. 164-8, pp. 2, 3]. DOC officials twice asked Dockery's sister to provide information with specific details to corroborate her charges. [ECF No. 149-5, p. 2, 164-8, p. 3]. However, Dockery alleges that after his sister lodged her complaint, "on or around July 6, 2007," Defendant Berto, a corrections officer at SCI-Forest, threatened that if he and his sister "continue to stir the pot," he would "not see her again." [ECF No. 149-5, p. 40]. Plaintiff alleges that this incident led her to drop the complaint and to the issuance of two "fabricated" misconduct charges against him by Defendant Berto on July 12, 2007. [ECF No. 148, p. 3].

The first misconduct, Misconduct No. A646820, arose out of an altercation between Dockery and another inmate, which ended with Dockery threatening to stab the other inmate. [ECF No. 152-3, p. 2]. The incident was witnessed by Corrections Officer Berto and Corrections Counselor Whitman and resulted in the issuance of a misconduct and a disciplinary hearing. Dockery first challenged the propriety of the misconduct hearing, stating that he never received a copy of the misconduct and so had no notice of the charges against him. [ECF No. 152-3, p. 4]. However, given the fact that Dockery had submitted a detailed witness request form to prepare for the hearing, the hearing examiner rejected Dockery's contention that he had not received notice.[3] [ECF No. 152-3, pp. 3-4]. In addition, Dockery admitted that he "exchanged words" with the inmate, but denied making a threat. [ECF No. 152-3, p. 4]. The hearing examiner was "not persuaded" by Dockery's version of events, finding Defendant Berto's report to be clear and credible, and assessed Dockery Disciplinary Custody status for 60 days. Dockery subsequently filed an untimely appeal of the misconduct, which was denied. [ECF No. 152-3, p. 5].

---

[3] As is evident throughout the record of this matter, Plaintiff's lack of candor to both DOC employees and this tribunal is quite disturbing. This Court finds there is a pattern of lack of candor by Dockery with regard to many of the claims asserted in his Complaint, his Motion for Summary Judgment and his Brief in Opposition to Defendants' Motion for Summary Judgment. It is noted that where a claim is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

Dockery alleges that on July 12, 2007, a second retaliatory misconduct was also issued, Misconduct No. 641190, accusing him of threatening a counselor and using the same language as that cited in Misconduct No. 646820. No hearing was ever scheduled for this allegedly issued second misconduct and it was not mentioned in the disposition of Misconduct No. 646820. Dockery alleges that on July 17, 2007, he decided to show a passing supervising captain his copy of the second misconduct. Dockery avers that he was told that the signature appearing on the form was forged and would be investigated. [ECF No. 148, p. 3].

Dockery asserts that because Misconduct No. 641190 was forged, it necessarily means that Defendant Berto issued both Misconduct No. 641190 and No. 646820, and fabricated the charges related to Misconduct No. 646820, rendering it invalid. [ECF No. 152-3, p. 6; No. 148, p. 3]. Viewing the record evidence in the light most favorable to Plaintiff, other than Dockery's self-serving statements, there is no evidence that the Misconduct No. 641190 was ever officially issued or that Defendant Berto was involved in its creation. The Court has been provided a copy of the Plaintiff's misconduct history covering the period of his incarceration from September 19, 1997, through October 8, 2009. [ECF No. 152-9]. The uncontroverted evidence contradicts Plaintiff's assertion that Misconduct No. 641190 was issued against him. The Security Office investigated Dockery's allegations concerning the forged misconduct, and concluded that it could not be determined who wrote the misconduct, as it was neither logged, nor "entered into the mainframe" and Dockery "did not go to a hearing or receive any kind of sanction, [and] therefore, [Dockery] did not suffer any adverse consequences" from its existence. [ECF No. 152-3, p. 13]. The Security Office eventually concluded that Dockery obtained a blank misconduct form and forged Misconduct No. 641190. Dockery's appeal related to the validity of

Misconduct No. 646820 on this basis was summarily rejected. [ECF Nos. 152-4, p.2; 152-3, pp. 7-13].

### 2. Retaliatory Cell Search

Two weeks after Dockery reported his alleged receipt of the mysterious Misconduct No. 641190, his cell was subject to a routine search. Dockery contends that the search was retaliatory and that the two officers assigned to conduct the search "went directly to [his] desk" and "confiscated all grievances, misconducts, appeals, responses from request to staff and other important evidence in an attempt to get rid of the evidence Plaintiff has in his possession regarding fabricated and forged misconduct reports." [ECF No. 5, ¶ 36, ECF No. 165, p. 10]. Plaintiff filed a grievance related to the search because he was not provided a receipt itemizing the confiscated items. [ECF No. 152-3, p. 11]. His grievance was rejected as was a subsequent appeal. [ECF No. 152-3, pp. 7-13]. Plaintiff now claims that Defendants Griffen and Johnson confiscated and destroyed documents, which he contends "prevented [him] from pursuing certain other parties and claims in [this] lawsuit." [ECF No. 165, p. 10]. Plaintiff does not disclose the claims precluded by Defendants' conduct nor does he describe how such claims were detrimentally affected. Id. Plaintiff alleges that his property was taken without due process, which resulted in an injury because, in the absence of a confiscation receipt itemizing the items retrieved from his cell, he does not know if all of his property was returned and so cannot file a claim. [ECF No. 165, p. 8].

During the cell search, Dockery was handcuffed and tethered outside his cell door. Upon the completion of the cell search, Dockery refused to reenter his cell and relinquish his handcuffs. [ECF No. 152-11, pp. 2-20]. After being given several direct orders to reenter his cell, Dockery was placed into his cell. Dockery then threatened Lieutenant Burkhart, claiming

he would kill him by stabbing him in the neck. Dockery was subsequently charged with threatening an employee, threatening another person, and refusing to obey an order. [ECF No. 152-9, pp. 3-4, 152-10].[4] Dockery contested the charges, claiming that the incident never occurred, that he was never out of his cell and that the misconduct was erroneously written up by a witness instead of Lieutenant Burkhart. [ECF No. 152-10, pp. 3-9]. After a hearing, Dockery was found guilty of the misconduct and sanctioned with 60 additional days in Disciplinary Custody, which he appealed to no avail. [ECF No. 152-9, pp. 3-4].

Dockery then filed a grievance claiming excessive force was used in returning him to his cell, causing "bruising and swelling to [his] wrist." [ECF No. 152-11, p. 2]. Documentation of the occurrence indicates that only after assembling a cell extraction team to retrieve Dockery's handcuffs and repeatedly instructing Dockery to place his hands through the cell door "wicket," Dockery finally complied and the handcuffs were removed without any further use of force. Dockery was examined by a nurse and while complaining of wrist pain later in the day, neither visible injuries nor redness were noted. [ECF No. 152-11, pp. 3-20]. Dockery filed a grievance approximately eleven days later against Lieutenant Burkhart and Sergeant Thomas for injuries allegedly sustained in the incident, seeking "compensation for the pain & suffering." [ECF No. 152-11, pp. 2-3].

Defendant Riskus investigated Dockery's claims of abuse but concluded that Plaintiff's claims could not be substantiated as any injury likely occurred prior to the cell extraction incident when Dockery separated a tether from the cuffs and stepped over the cuffs so his hands

---

[4] Dockery contends that Defendants' reference to his threat against Lieutenant Burkhart is irrelevant and in error because, "Officer Burkhart is not a defendant in plaintiff civil complaint therefore should not be apart of the defendants statement of material facts." [ECF No. 166, p. 2, ¶8] *(sic passim)*. While Plaintiff may be displeased with this evidence, Plaintiff's behavior is clearly relevant to his claims for excessive use of force and his subsequent placement in specialized DOC housing units, which he also challenges.

would be in front of him, and hit a vent. [ECF No. 152-11, p. 9]. Plaintiff presents no additional

evidence supporting his claim that excessive force was used.

### 3. Retaliatory and Discriminatory Misconduct

Dockery next alleges that on September 3, 2007, two months that after receiving the

allegedly fabricated Misconduct No. 641190, he received another "misconduct," dated

September 11, 2007, at Misconduct No. 641191. [ECF No. 5, ¶¶ 37-41]. Dockery contends this

misconduct form was found on the floor of his cell. The form was not entirely filled out, but

contained the statement "On above date & time all Moslems must die (sic)." Dockery contends

this threat was not properly investigated as a hate crime and that prison security officials

attempted to "sweep this hate crime under the rug until plaintiff contacted state police via letter."

[ECF No. 5, ¶ 37]. However, the evidence establishes that Defendant Riskus did conduct an

investigation. [ECF No. 152-4, p. 7]. Defendant Riskus first compiled a list of staff members

assigned to work on Plaintiff's cell block during the shifts on the day and evening prior to

Plaintiff's discovery of the misconduct form. Handwriting comparisons then were made to

determine if a staff member was the author of the form. However, the investigation substantially

reduced the probability that a staff member at SCI-Forest was the perpetrator of the "threat":

> The Security Office has found that inmate Dockery has received a similar
> misconduct for forging a bogus misconduct and was given a DC sentence for that
> infraction. The misconduct received on September 3rd closely resembles the
> misconduct that was forged on 7-12-07. The Security Office although we can not
> substantiate it believes that in some way inmate Dockery obtained another blank
> misconduct and created another bogus misconduct in attempts to discredit SCI
> Forest Staff or obtain a transfer. It is further believed that inmate BK8487
> Dockery may have assistance from an inmate whom is not being housed in the
> RHU assisting him in this endeavor.

[ECF No. 152-4, p. 7]. Dockery contends that he was not actually charged with an infraction

related to the July 12, 2007, forged misconduct, and so the investigation into the September 2007

incident is faulty.  Because the investigation into the September 2007 incident was inconclusive, no disciplinary charges were filed against Dockery and he suffered no repercussions from the event other than viewing the note itself.

### 4.      Transfer to SCI-Fayette/Administrative and Disciplinary Custody

Dockery next complains of the circumstances surrounding his transfer from SCI-Forest to SCI-Fayette, contending that his transfer and placement into administrative custody was in violation of his right to due process and in retaliation for filing grievances at SCI-Forest.  [ECF No. 5, ¶¶41, ECF No. 149, ¶ 21].  The record evidence indicates that prior to his transfer, Dockery was confined to Disciplinary Custody for several consecutive terms due to misconducts issued against him related to his threatened assaults on inmates and corrections officers, as well as other serious offenses.  [ECF No. 152-10, p. 5].  As a result of his threats, it was determined that Dockery would be transferred to another DOC facility to separate him from his intended targets.  Id.

In accordance with the transfer decision, on or about November 20, 2007, Plaintiff was moved to SCI-Fayette and was provided notice that pursuant to DOC policy, he would be placed into Administrative Custody until his complete records were available to determine his housing needs at SCI-Fayette.  [ECF No. 152-5, p. 2].  A preliminary review completed on November 21, 2007, confirmed that he was confined to administrative custody because of security concerns related to his extensive prior behavioral record.  [ECF No. 152-5, p. 3].  It was determined that he would remain in administrative custody for a possible Special Management Unit ("SMU") referral and that he could not be released until further review was approved.  Id.  One week later, Dockery filed a request that he be released from Administrative Custody, candidly acknowledging that his placement in SCI-Fayette's Special Management Unit was due to his

"problematic past," but asking that he be provided an opportunity to prove that he could abide by the rules and regulations he had so often violated before. [ECF No. 164-13, p. 2]. In response, Dockery was informed that a review of his records revealed that he may not have been recommended for the SMU program, but indicated that he would be recommended for placement on the "Restricted Release List." Id. Placement on the Restricted Release List would require Dockery's long-term placement in administrative custody, away from general population. DOC Policy DC-ADM 802 1 –A, B. [5]

While Plaintiff now contends he was never informed of the reasons for his placement in Administrative Custody nor given an opportunity to challenge his placement, the records provided by him belie this assertion. Indeed, Dockery readily admitted that within days of arriving at SCI-Fayette, he was informed of his placement in the SMU based upon security concerns. [ECF No. 164-13, p.2]. Plaintiff's periodic Program Review Committee records reveal that Dockery refused to attend at least one review and that he was subsequently determined to pose a danger to himself and others after accumulating additional misconduct charges related to additional assaults and threatened assaults. [ECF No. 152-5, pp. 2-10]. As of November 6, 2008, Dockery had accumulated sufficient misconduct infractions to extend his disciplinary custody through January 22, 2009; and in the 10 month period from May 2008 through March 2009, Plaintiff was found guilty of an additional 11 misconduct charges. Id. at 10. Throughout November 2007 through January 2009, the record establishes that while housed at SCI-Fayette, Dockery's status was discussed with him at periodic review hearings and that he was afforded multiple opportunities to lodge complaints concerning his placement.

---

[5] Plaintiff repeatedly contends that he "successfully" challenged his SMU classification based solely upon the response of Superintendent Coleman, suggesting that he would be recommended for placement of the Restricted Release List. Because this classification would result in Plaintiff's long-term confinement to Administrative Custody, it is difficult to comprehend how this was a "successful" challenge to his SMU assignment.

### 5.    Transfer to Secure Special Needs Unit

On November 8, 2008, Plaintiff was informed that he was being referred for placement in the Secure Special Needs Unit ("SSNU") to determine if his behavioral issues were "not due to mental health reasons." [ECF No. 164-14, pp. 5-6; ECF No. 152-5, pp. 10-14]. The placement procedures for the SSNU were explained to him, as was his right to appeal the decision. [ECF No. 152-5, p. 10]. Dockery immediately appealed his assignment to SSNU to no avail, and was provided the frank explanation by Superintendent Coleman that "review of your adjustment record during your incarceration prompts me to support your Unit Teams/Program Review Committee recommendation that your name be submitted for the SSNU Program! I cannot release you to general population when you keep getting more disciplinary custody time. I believe a change will do you good!" [ECF No. 152-5, p. 13].

The earlier recommendation that Dockery be placed on a Restricted Release List would have required his long-term placement in segregated Administrative or Disciplinary Custody status. However, per DOC policy, a transfer to the SSNU was a required first step, to determine if appropriate mental health treatment would resolve Plaintiff's behavioral issues. [ECF No. 164-14, p. 6]. Plaintiff remained in Disciplinary Custody (for prior infractions) and then in Administrative Custody until a bed in the SSNU was available. Plaintiff objected to his retention in Disciplinary and Administrative Custody while waiting for a bed to become available and filed a grievance, alleging that he was not provided mental health treatment and was left to linger in "solitary confinement," never leaving his cell. [ECF No. 152-24, p. 3-4]. His complaints were investigated and it was determined that he was less than truthful. The records provided to the Court indicate that Dockery was visited by a mental health counselor on 25 occasions in the period January 2008 through April 2009 but refused to interact with the psychology staff. [ECF

No. 152-24, p. 2].   His restrictive housing unit was not a "solitary confinement" unit, and he would have been able to leave his cell had he not incurred additional misconducts or repeatedly refused "yard" time.  Further, Plaintiff was not deprived meals, but repeatedly "implemented hunger strikes as a means of unfounded rebellious behavior." [ECF No. 152-24, p. 2].

By May 15, 2009, Dockery was removed from SCI-Fayette's mental health roster because he was transferred to the Long-Term SSNU at the State Correctional Institution at Cresson ("SCI-Cresson").[6]  [ECF No. 17 ¶ 8, ECF No. 164-17].  Plaintiff's claims that his time in the SSNU and the RHU were retaliatory and without legitimate penological interest are not supported by the evidence of record.

Plaintiff also alleges that his confinement to special housing units constituted cruel and unusual punishment because the conditions of the units required him to be housed with mentally ill inmates who routinely assault others with urine and feces.  [ECF No. 5, ¶ 40, ECF No. 165, pp. 17-18].  Plaintiff attempts to document these allegations with a single instance of an assault by another inmate who threw feces at him while in an exercise yard.  [ECF No. 164-19, pp. 2-3].  Plaintiff supports his claims with his own Affidavit, decrying the conditions of his confinement as inhumane.  Plaintiff directs attention to his grievance record at SCI-Fayette as evidence of the conditions of confinement.  Plaintiff filed 59 grievances for mail issues, problems with staff, property claims, medical co-pays, etc., but only four grievances related to "hygiene" and two

_____

[6] Plaintiff's claim of retaliatory transfer to the SSNU presents yet another instance of Plaintiff's abject lack of candor with the Court. Plaintiff has manipulated his treatment records produced in support of his Motion for Summary Judgment and in opposition to Defendants' Motion for Summary Judgment, claiming that he was unlawfully subjected to a retaliatory transfer to the SSNU when he did not need mental health treatment. [ECF No. 165, p.14]. Plaintiff claims, per the treatment notes of Dr. Saavedrado, that he was deleted from the Mental Health roster at SCI-Fayette because he no longer needed treatment and could be released to general population. [ECF No. 165, p. 15]. Instead, it is clear that he was deleted from SCI-Fayette's mental health roster because he had been transferred to SCI-Cresson, where he remained in the SSNU until he was transferred to the SSNU at SCI-Frackville. As of November 17, 2011, he was removed from the SSNU (over his apparent strenuous objection) because of his continued "disruptive behavior [which] affects the progress of other inmates in the program."  [ECF No. 164-18]. However, as of April 24, 2012, Plaintiff remained in Disciplinary Custody due to additional assault allegations [see, Dockery v. Wentzel, No. 11-1368 M.D. Pa. [ECF No. 32, p. 2]].

grievances related to "conditions." [ECF No. 164-20, pp. 2-6]. Plaintiff provides no information regarding the content of the grievances and so it is impossible to discern whether the grievances relate to his allegations of constant exposure to bodily fluids and excrement or to something entirely benign.

### 6. Assault/Excessive Force Incidents

Dockery's placement in Disciplinary Custody at SCI-Fayette prior to his transfer to the SSNU was predicated upon, *inter alia*, an assault on a staff member [ECF Nos. 152-6] and a refusal to relinquish handcuffs when being returned to his cell [ECF No. 152-7]. Plaintiff claims that both incidents were either fabricated in retaliation for his grievances in violation of his First Amendment rights or resulted in the unconstitutional use of excessive force in violation of his Eighth Amendment rights.

The first incident occurred on September 16, 2008, when Dockery received a misconduct for assaulting Corrections Officer Ankron with a food tray. Plaintiff alleges that prior to the incident, Defendant Ankron and Corrections Officer Stroutman attempted to move him to a new cell. [ECF No. 5, ¶¶ 41.42, ECF No. 149, p. 6]. The new cell had a clogged toilet. Dockery alleges he responded by protesting, laying down the floor, and refusing to enter the cell. Id. Plaintiff alleges that his protest led Lieutenant Vojacek to order Plaintiff to be returned to his old cell until the toilet could be fixed. Id. Plaintiff further alleges that in retaliation for his behavior, during his evening meal Defendant Stroutman "flipped" his food tray, causing the food to be in "disarray." [ECF No. 5, p. 9]. Plaintiff's Complaint alleges that he refused the tray and his "food slot" was locked, depriving him of a meal. Plaintiff concedes that he responded by kicking his cell door, encouraging other inmates to kick their cell doors and refusing direct orders to stop kicking his door. [ECF No. 5, ¶ 45].

Defendants' version of events reflects that Plaintiff was charged with a misconduct for, *inter alia*, first throwing his food tray through the slot, striking Defendant Ankron in the leg with the tray, and then repeatedly kicking his door and encouraging others to join his protest. [ECF No. 152-6]. As a result of his behavior, Plaintiff was placed on a "Behavior Modified Diet" of a "food loaf" which he was served for five days. [ECF No. 152-6, pp. 2-3]. Plaintiff claims, without explanation, that this caused additional hardship because he was fasting for Ramadan, which was noted by staff placing him on the modified diet. [ECF No. 165, p. 4, ECF No. 152-6, p. 2]. Dockery pled guilty to charges of refusing to obey an order (with regard to kicking his door), and based upon the evidence presented to the Hearing Examiner, was found guilty of striking Officer Ankron with his food tray and encouraging unauthorized group activity. [ECF No. 152-6, p. 9]. Plaintiff appealed the misconduct decision, which was affirmed because the Hearing Examiner's findings were "amply supported by [the] evidence presented." [ECF No. 152-6, p. 12].

The second excessive force claim occurred on November 7, 2008, when Plaintiff protested the manner in which his cell was searched. Dockery contends that during the search, his magazines were confiscated, leading him to refuse to relinquish his handcuffs. Plaintiff protested that he wanted to speak with Defendant (Captain) Leggett before cooperating. [ECF No. 152-7, p. 5]. Corrections officers took control of the situation by using a tether attached to the handcuffs to gain control over Dockery's hands and to prevent Plaintiff from using the handcuffs as a weapon. In a grievance filed arising out of the incident, Plaintiff contended that in the course of retrieving the handcuffs, the tether was "forcefully pulled," "snatching his hands" through the wicket. [ECF No. 152-7, p. 32]. In the process, Plaintiff alleges he sustained deep abrasions and swelling to his wrists. Id. Plaintiff also alleges that DOC officers refused to

open his cell door so that a nurse could clean off any blood on his wrist. Id. Instead, a nurse conducted a visual inspection, photographed Dockery's arms and instructed Plaintiff to wash his wrist with soap and water. [ECF No. 152-7, p. 24].

Plaintiff's grievance alleging abuse prompted an investigation by the DOC Office of Professional Responsibility. [ECF No. 152-7, p. 2]. The investigation consisted of interviews of all participants, including Plaintiff. No allegations of abuse were substantiated. Instead, it was determined that staff acted appropriately by using the tether to effectuate the retrieval of the handcuffs. [ECF No. 152-7, p. 4]. Further, the medical report prepared on the afternoon of the incident indicates that Plaintiff suffered only small superficial abrasions, with no swelling and no bruising. [ECF No. 152-7, p. 24]. A misconduct charge was filed against Dockery, and a hearing on the matter resulted in a finding of guilt and the imposition of an additional 45 days in Disciplinary Custody. [ECF Nos. 152-7, p. 26; 152-9, p. 3].

### 7. Property Loss/Confiscation

Plaintiff next claims that his property was wrongfully taken in violation of his rights to due process. This claim is with regard to the handling of his "in-cell" property which was placed in storage in October 2008 when Plaintiff was transferred to the State Correctional Institution at Waymart ("SCI-Waymart") for a mental health assessment. Plaintiff alleges that certain documents were lost, forever and irreparably harming his ability to file claims in this action as well as a successful PCRA petition challenging his underlying 1991 murder conviction. [ECF No. 5, ¶¶ 50-51, 73, 79, 80; ECF No. 149, pp. 4-5].

With regard to evidence related to his underlying conviction, Plaintiff concedes, as he must, that he had previously submitted copies of his "newly discovered evidence" to Judge Harold Kane of the Court of Common Pleas of Philadelphia County with his May 2008 PCRA

Appeal *Nunc Pro Tunc*. [ECF No. 164-27, p. 5; and see Docket (n.1 *supra*), p. 10].

Accordingly, Dockery has not "lost" any rights which he asserts may have flowed from this "Brady evidence." Indeed, Dockery filed a motion with Judge Kane, requesting that copies of his most recently filed PCRA petition be sent to him to replace the items he claimed were taken by Defendants from his cell. Id.[7] The "evidence" thus exists and Plaintiff is well aware of a means of obtaining it.

With regard to the remainder of Plaintiff's remaining missing property, Dockery alleges that correspondence from various public officials, books, underwear, and shower shoes, personal correspondence and family photos were lost. [ECF No. 165, p. 26, n.3]. Plaintiff alleges that he participated in the grievance procedure to recover his property and DOC officials informed him that they believed they had located all of his property. Id. As indicated by Plaintiff's "Request to Staff Member" directed to Superintendent Coleman, dated November 20, 2008, Plaintiff confirms that no civil claims have been lost or injured because of the missing material:

> As I stated to you that I did not ask for a legal exchange but to receive all my (in cell) property that was packed I went TT. That includes legal, religious, dept policies complaints and responses from PSP, Atty, US Justice Dept., PSCOA and PA Stat Board of Psychology against staff at SCI-Forest and SCI-Fayett. Which is why you've instructed your staff not to relinquish my property in order to destroy my evidence. This is retiliation!
>
> *However, I do not need or want any of those documents back, my family have copies of most of those documents especially those pertaining to Forest.* I do ask that you instruct your staff to return my legal work pertaining to an active criminal matter in the Phila. Court, my religious material and personal miscellaneous items such as long underwear, underwear, socks, shower shoes, comb, deodorant, toothpaste. I'm in need of my hygiene supplies. I do not have any money at this time to purchase others. …(*sic passim*)

---

[7] Dockery thus provides yet another troubling example of his lack of candor, and ignores record evidence provided by him that he has the ability to locate copies of the "Brady material" (on file in the Court of Common Pleas of Philadelphia County). Instead, Dockery argues to this Court that ""Plaintiff has lost all of his notes of testimony as well as his newly discovered evidence, [and so] cannot pursue his criminal matter on collateral, appeal or habeas corpus as a result plaintiff has been severely injured." [ECF No. 165, p. 29].

[ECF No. 164-25, p.4 (italics added)].  Given the existence of copies of the allegedly missing documents, Plaintiff's Complaint and discovery conducted to date do not substantiate his allegations regarding injury to any existing or potentially viable claim. Further, the grievance record indicates that Plaintiff's in-cell property was subsequently located with Plaintiff's stored belongings in the RHU property room and Plaintiff was afforded an opportunity to inventory his property to determine if anything was missing.  Accordingly, his grievance was marked "resolved."  [ECF No. 164-25, p. 11.]  Plaintiff did not seek any additional state remedies for the loss or destruction of his property and there is no evidence linking the alleged destruction of property to an act of retaliation by any individual against whom Plaintiff had previously filed a claim or grievance.

### 8.     Behavior Modified Meals

Dockery next alleges claims against Defendant Vojacek for attempting to place him on a Behavior Modified Meal "in retaliation for past complaints against staff in the restricted housing unit."  [ECF No. 165, p. 35].  This alleged act of retaliation is not linked to any specific conduct, incident or individual, and was investigated through the grievance process. As indicated by the records provided, Plaintiff was "legally placed on food loaf per order of Captain Leggett for refusing to return [a] food tray on 12/22/2008. However, at the discretion of Captain Leggeett, [Plaintiff] was removed from the food loaf on 12/23/2008.  Due to an oversight, the 2-10 shift was under the assumption that [Plaintiff] was still on the behavior modified meal. [Lieutenant Vojacek] was contacted by Sgt. Haywood on that day and [Plaintiff was] issued a regular tray." [ECF No. 152-21, p. 2].  Plaintiff concedes he did not miss a meal as the situation was rectified immediately.  [ECF No. 165, p. 36].

### 9. Vojacek Assault

Dockery next alleges that Defendant Vojacek fabricated a misconduct on December 30, 2008, when Plaintiff intentionally exposed Defendant Vojacek to fecal matter and urine. Plaintiff called Defendant Vojacek to his cell to report a leaking toilet. The Plaintiff was instructed not to flush the toilet while Defendant Vojacek turned off the water supply; however, Plaintiff disregarded these instructions, flushing the toilet and exposing Defendant Vojacek's eyes and mouth to feces, urine and waste water. As a result, Defendant Vojacek received medical treatment at Uniontown Hospital. Plaintiff pled not guilty Misconduct No. 735756, issued for refusing to obey an order. After a hearing on the matter, Plaintiff was found guilty, assessed 90 days in Disciplinary Custody and further assessed the costs of Defendant Vojacek's medical treatment.[8] [ECF No. 152-16, p. 3] Plaintiff's subsequent appeals of the misconduct were denied, based upon the evidence presented. [ECF No. 152-16, pp. 5-16]. Plaintiff contends that this misconduct report was fabricated "in retaliation for past complaints against staff," but again does not provide any support for his assertions connecting the issuance of the misconduct to Defendant Vojacek or any participant in the grievance process.

### 10. Inmate Account and Mail Issues

Plaintiff next alleges that Defendant Tony wrongfully debited his inmate account $10 for medical treatment Plaintiff did not request or authorize. Plaintiff contends that this resulted in a violation of his due process rights. [ECF No. 165, p. 26]. However, as is made clear by the grievance history related to this claim, on March 4, 2009, Plaintiff was seen once at his cell by medical staff because he was participating in a hunger strike and once again the same day

---

[8] Plaintiff complains that a second misconduct was wrongfully issued arising out of the same incident; however, the second misconduct was issued by Defendant Vojacek's supervisor after confirming the cost of medical treatment received by Defendant Vojacek. This misconduct was dismissed without prejudice because the sanction requested (reimbursement of medical expenses) had previously been imposed on Plaintiff in the course of resolving the initial misconduct arising out of the incident. [ECF No. 164-30, pp. 14-15; ECF No. 152-16, p. 3].

because he was complaining of shortness of breath.  Pursuant to DOC policy, an inmate is required to pay a co-pay fee for non-emergency medical services provided to an inmate for self-inflicted illness or harm. [ECF No. 152-14, p. 7].  In resolving Plaintiff's grievance, filed only as to the charge for the first cell visit, Superintendent Coleman determined that because the cell visit was necessitated by Plaintiff's hunger strike, Plaintiff's prior authorization for the charge was not required and was appropriately deducted from his account.  [ECF No. 152-18].

Plaintiff next complains about erroneous deductions from his inmate account for $8.87 representing costs incurred with replacing a broken typewriter.  The evidence presented establishes that Plaintiff's typewriter was shipped to Smith Corona for repairs in June 2008.  The cost of shipping was $8.87.  Because the typewriter was under warranty, the Plaintiff's typewriter was not repaired, but replaced.  [ECF No. 152-22, p. 2-7].  Plaintiff's new typewriter was repaired the following year (in February 2009) and the cost of shipping was $6.66.  Plaintiff asserts that the discrepancy in postage fees requires the Court to find that the typewriter was never shipped in June and the first charge was erroneously debited from his account in violation of his rights to due process.  [ECF No. 165, pp. 41, 42].

Plaintiff complains about alleged tampering with his legal mail, but offers no facts to support his allegations.  Instead, Plaintiff speculates that the timing of his receipt of a notice of dismissal in connection with his state PCRA petition and the replacement of his typewriter are somehow related to Defendants' tampering with the envelope containing the Complaint filed in this action and perhaps reading it before it was filed.  [ECF No. 165, pp. 27-30, 40-41].  Plaintiff alleges that he was given a new typewriter and that he finally received notice that his PCRA

petition was denied because Defendants read his complaint.[9]  Plaintiff's theory, however, is not supported by any record evidence.

### 11.    Medical Treatment – Deliberate Indifference

Plaintiff's final claim, against Defendant Jennings, arises out of Jennings' failure to open the cell door wicket on November 7, 2008, to permit a nurse to clean the abrasions sustained when Defendants used a tether to regain control of Plaintiff after he refused to relinquish his handcuffs. [ECF No. 165, p. 43; ECF No. 152-7, p. 32].  Plaintiff claims that Defendant Jennings displayed deliberate indifference to Plaintiff's medical condition and interfered with the nurse's attempt to treat him.  However, the medical report and notes from the event prepared by B. Bilohlavek, RN, indicate that Defendant sustained small, superficial abrasions on his left wrist.  He was instructed to wash his wrist with soap and water.  [ECF No. 152-7, p. 24]. Plaintiff does not provide any evidence that he was incapable of washing his own wrist with soap and water and there is no indication that any further treatment was needed.  Id.  Further, the medical records do not reflect any interference with treatment.

### 12.    Spoliation of Evidence Claim

Plaintiff's Motion for Summary Judgment also seeks the entry of judgment in his favor as to all claims in his Complaint because of alleged spoliation of evidence with regard to video tapes Plaintiff contends existed and would have supported his claims.  As fully discussed in the Order [ECF No. 138] regarding Plaintiff's Application for Spoliation of Sanction [ECF No. 133],

---

[9] Plaintiff alleges that after filing his Complaint in this action in June 2009, he received notice that his PCRA petition filed in 2005 was denied – giving rise to his suspicion that his mailed was tampered with because the Complaint filed in this action raised a claim related to the destruction or loss of "after-discovered" evidence.  In his mind, Judge Kane suddenly and mysteriously sent notice that his 2005 PCRA petition was dismissed because Defendants somehow communicated the claim to Judge Kane.  [ECF No. 165, p. 29].  However, a review of his underlying criminal docket at CCP-51-CR-0742101-1989 (Court of Common Pleas of Philadelphia County, Pennsylvania) reveals that Plaintiff had filed a fourth PCRA petition on May 20, 2008.  On March 9, 2009, Judge Kane issued a PCRA-Dismissal Notice and the petition was dismissed as frivolous on May 12, 2009.   [ECF No. 164-27 p. 5].  Both were mailed prior to the filing of Plaintiff's Complaint in this matter.

the evidence presented to the Court unequivocally indicates that existing videos have not been altered in any way or, where videos no longer exist, they were recorded over in the ordinary course of business because no extraordinary or planned use of force event occurred requiring retention. In addition, Plaintiff has not established that he has suffered or could have sustained prejudice from the destruction of a routine video that was not preserved. Accordingly, it is recommended that Plaintiff's Motion for Summary Judgment on this basis is denied.

### C.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Startzell v. City of Philadelphia, 533 F.3d 183, 192 (3d Cir. 2008), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). A "principal purpose[ ] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ... and it should be interpreted in a way that allows it to accomplish this purpose." Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

In this case, as the moving party, Defendants bear the initial burden of showing there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n. 10 (1986). In order to satisfy this burden, Defendants need not "produce evidence showing the absence of a genuine issue of material fact;" instead they may simply point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; Allen v. Susquehanna Twp. Sch. Dist., 233 F. App'x 149, 152 (3d Cir. 2007). Mere factual disputes between the parties are insufficient to defeat an otherwise properly

supported motion for summary judgment; "the requirement is that there be no genuine issue of material fact." Liberty Lobby, 477 U.S. at 247-248. A fact is "material" if it may affect the outcome of the matter pursuant to the underlying law. Id. at 248; Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). In deciding if a dispute is "genuine," the court must avoid weighing the evidence or determining the truth of the matter, but consider only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248.

Once Defendants carry this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587, quoting Fed.R.Civ.P. 56(e). The burden on the nonmoving party is substantially heavier at this stage in that he must provide evidence to establish the existence of every element essential to his case, and for which he will bear the burden of proof at trial. Celotex, 477 U.S. at 322; Monroe v. Beard, 536 F.3d 198, 206-207 (3d Cir. 2008). To avoid summary judgment, a plaintiff may not speculate or rest on the allegations in the pleadings, but rather must present competent evidence from which a jury could reasonably find in his favor. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir.1999) (speculation and conclusory allegations do not satisfy the nonmovant's burden at this stage). To meet its burden, the nonmoving party may use any type of evidentiary material "listed in Rule 56(c), except the mere pleadings themselves;" this material need not, however, be "in a form that would be admissible at trial." Celotex, 477 U.S. at 324. While Plaintiff need not prove his case, he must show that there is a genuine issue for trial; "some metaphysical doubt as to the material facts" or a "a scintilla of evidence" is not sufficient. Matsushita, 475 U.S. at 586; McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424, 436-437 (3d

Cir. 2007) (the nonmoving party must "present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue" for trial.)

In the past, the standard rule has been that in deciding a motion for summary judgment, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000), quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994); Startzell, 533 F.3d at 192. However, and with particular relevance to Plaintiff's current action, the United States Supreme Court has recently refined that standard, concluding that

> facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts....When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, the court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380 (2007). That is, this court must determine "the relevant set of facts and draw[ ] all inferences in favor of the nonmoving party to the extent supportable by the record." Scott, at n. 8 ; Phillips v. Nw. Reg'l Communications, 669 F. Supp.2d 555, 568-69 (W.D. Pa. 2009) aff'd sub nom. Phillips ex rel. Estate of Phillips v. Nw. Reg'l Communications, 391 F. App'x 160 (3d Cir. 2010).

##### D. DISCUSSION

Plaintiff seeks to impose liability against Defendants pursuant to 42 U.S.C. § 1983. To recover for a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must prove: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S.

327, 330–331 (1986).  Plaintiff's remaining Section 1983 claims include alleged retaliation, inhumane conditions of confinement, excessive force and procedural due process violations. These claims are discussed below.

### 1.    First Amendment Retaliation Claims

Plaintiff alleges that he suffered several fraudulent misconducts, assignment to a restricted housing unit and property confiscation in retaliation for his sister's report to the Pennsylvania Inspector General and the DOC that unnamed corrections' officers at SCI-Forest were reporting to work intoxicated, and in retaliation for filing unspecified grievances against various unnamed employees at SCI-Forest and SCI-Fayette.  [ECF No. 5, ¶ 30].

It is well settled that retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment, which is actionable under Section 1983.  Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir.1990). However, merely alleged retaliation is insufficient. In order to prevail on a retaliation claim, a plaintiff must show three things:   (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) that he was subjected to adverse actions by a state actor (here, the prison officials); and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.  See Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997).

With respect to the first factor, it is well settled that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right. Allah v. Seiverling, 229 F.3d 220, 224–25 (3d Cir. 2000). Accordingly, a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he

was denied. <u>Rauser</u>, 241 F.3d at 333. Rather, the first requirement a Plaintiff must show is that the conduct which led to the alleged retaliation was constitutionally protected. <u>Id.</u>

The second element requires a prisoner to show that he suffered some "adverse action" at the hands of the prison officials. A plaintiff can satisfy the second requirement by demonstrating that the "adverse" action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." <u>See</u> <u>Allah v. Seiverling</u>, 229 F.3d at 225. Adverse actions that are sufficient to support a retaliation claim include filing false misconduct reports, <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, <u>Rauser</u>, 241 F.3d at 333, and placing a prisoner in administrative custody, <u>Allah</u>, 229 F.3d at 225.

The third factor requires that there be a causal link between the exercise of the constitutional right and the adverse action taken against the prisoner. <u>Rauser</u>, 241 F.3d at 333–34. This may be established by evidence of a temporal proximity between the prisoner's protected activity and the defendant's adverse action; however, the timing of the alleged retaliatory action must be suggestive of retaliatory motive. <u>See</u> <u>Lauren W. ex rel. Jean W. v. Deflaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007) (to show a causal connection, a plaintiff must prove "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link"); <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 512 (3d Cir. 2003) (holding that the temporal proximity between the protected conduct and the alleged retaliatory action must be "unusually suggestive" before the court will infer a causal link) (<i>citing</i> <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503 (3d Cir. 1997)).

If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors. <u>Mt. Healthy</u>, 429

U.S. at 287. "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

With particular relevance to Plaintiff's First Amendment retaliation claims, to survive a motion for summary judgment, specific evidence of each element is required. In establishing the elements of a retaliation claim, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive. Crawford–El v. Britton, 523 U.S. 574, 600 (1998) (internal citations omitted). Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner. See Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995), cert. denied, 516 U.S. 1084 (1996); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). Finally, allegations of de minimis acts of retaliation do not state a claim under § 1983. Thaddeus–X v. Blatter, 175 F.3d 378, 397 (6th Cir. 1999); Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001) (holding that a de minimis retaliatory act is outside the ambit of constitutional protection). Using these precepts, the Court will review Plaintiff's retaliation claims.

### a. Forged Misconducts

Two of Dockery's claims of retaliation arise from "misconducts" Dockery claims were issued against him; the first, Misconduct No. 641190, allegedly forged by Defendant Berto, for

threatening to assault a counselor, and the second, Misconduct No. 641191, allegedly placed under his door by an unknown corrections officer with the words "all Moslims must die" (sic). While the circumstances surrounding their issuance are contested, it is abundantly clear that Plaintiff did not suffer any adverse action as a result of either "misconduct" and therefore, as a matter of law, neither supports a claim for retaliation against any Defendant. <u>See</u>, <u>Brightwell v. Lehman</u>, 637 F.3d 187, 194 (3d Cir. 2011).

In <u>Brightwell</u>, the United States Court of Appeals for the Third Circuit held that summary judgment was appropriate where a First Amendment claim was predicated upon allegedly retaliatory misconducts which were later dismissed. The Court, *citing* <u>Allah</u>, *<u>supra</u>*, held that in the absence of the imposition of a penalty, no "adverse action" was suffered "sufficient 'to deter a person of ordinary firmness from exercising his First Amendment rights.'" <u>Brightwell</u>, at 194. Here, it is clear that Plaintiff did not suffer a penalty arising out of either Misconduct Nos. 641190 or 641191. In the absence of a penalty, Plaintiff cannot establish a fundamental element of his claim, *i.e.*, that the issuance of either misconduct deterred him from filing additional grievances and exercising his right to petition DOC officials for relief (and the record blatantly belies such an inference). Accordingly, as a matter of law, Defendants are entitled to judgment in their favor as Plaintiff's First Amendment claims arising out of Misconduct Nos. 641190 and 641191.

### b. Misconducts for Behavior/Assault Infractions

Plaintiff next complains of the retaliatory issuance of false misconducts arising out of his many assaults upon corrections officers and repeated failure to obey direct orders. However, the filing of a prison disciplinary report is not actionable under 42 U.S.C. § 1983 as prohibited "retaliation" unless the report is, in fact, false. In other words, the finding of guilt of the

underlying misconduct charge satisfies a defendant's burden of showing that he would have brought the misconduct charge even if plaintiff had not filed a grievance. See Harris–Debardelaben v. Johnson, 121 F.3d 708, 1997 WL 434357, at *1 (6th Cir. July 31, 1997); Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998), *cert. denied*, 525 U.S. 907 (1998); Henderson v. Baird, 29 F.3d 464, 469 (8th Cir.1994) (a finding of guilty of a prison rule violation based on some evidence "essentially checkmates [the] retaliation claim."), *cert. denied*, 515 U.S. 1145 (1995). See also Alexander v. Fritch. 396 F. App'x 867, 874 (3d Cir. 2010) (holding that "because there was evidence to support the hearing examiner's finding of guilt, there was a legitimate penological reason for the charge and punishment"); Carter v. McGrady, 292 F.3d 152 (3d Cir. 2002) (noting that even if prison officials were motivated by animus to jailhouse lawyers, there was sufficient evidence of the plaintiff's misconduct offenses to conclude that the misconducts would have issued notwithstanding his jailhouse lawyering); Allah v. Al–Hafeez, 208 F. Supp.2d 520 (E.D.Pa. 2002).

In this case, each of the challenged misconducts involved either a well-documented assault on a corrections officer (No. 003055, throwing a food tray at Defendant Ankron)[ECF No. 152-6, 152-28]; (No. 735756, intentionally exposing Defendant Vojacek to fecal matter and urine) [ECF No. 152-16]; a documented refusal to relinquish handcuffs presenting an immediate risk to security (Nos. 643626, 763078)[ECF No. 152-8, 152-10]; and a simple refusal to obey a clear order (No.005371) [ECF No. 152-26], No. 726575 [152-27].  Dockery contested each misconduct charge and was found guilty by the hearing examiner based upon a review of the evidence presented.  [ECF No. 152-6, p. 9 (Ankron incident); ECF No. 152-16, p. 3 (Vojacek incident); ECF No. 152-10, p. 4 (first handcuff incident); ECF No. 152-8, p. 3 (second handcuff

incident); ECF No. 152-3, p. 4 (threatened assault on staff); ECF No. 152-26, p. 3 (refused direct order); ECF No. 152-27 p. 3 (refused direct order)] .

The findings of guilt are each based upon evidence that Plaintiff engaged in the acts for which he was accused. Thus, even if Plaintiff had presented sufficient evidence to support a prima facie case of retaliation (a holding this Court specifically does not make), he is essentially barred from succeeding on his retaliation claim because the findings of guilt as to the misconduct charges conclusively establish that Defendants would have taken the same actions regardless of any protected activity engaged in by Plaintiff. *Accord,* Nifas v. Beard, 374 F. App'x 241, 244 (3d Cir. 2010) (holding that Nifas's retaliatory discipline claim fails because there is "some evidence" supporting the guilty findings for the three disciplinary charges brought against Nifas after he filed his grievance), cert. denied, ___U.S. ___, 131 S.Ct. 2103 (2011); Romansky v. Stickman, 147 F. App'x 310, 312 (3d Cir. 2005).  Consequently, Defendants are entitled to the entry of judgment in their favor as a matter of law as to Plaintiff's First Amendment retaliation claims arising out of the appropriately issued misconduct charges.

### c. RHU/AC/DC/SSNU Housing Placement

Dockery also contends that his placement in Administrative Custody and the Secure Special Needs Unit was retaliatory, presumably for filing grievances against various DOC employees.  [ECF No. 165, p. 16].  However, Plaintiff fails to point to any evidence in support of his claim of retaliation against Defendants Burns and Popovich connecting his housing placement with any particular grievance or complaint lodged against either Defendant. [ECF No. 165, p. 11].  Thus, even assuming his placement was an "adverse action," there is no evidence supporting either the first or third elements of a First Amendment retaliation claim.  Rauser, 241 F.3d at 333; Crawford–El v. Britton, 523 U.S. 574, 600 (1998) (internal citations omitted).  In

addition, the evidence relied upon by Plaintiff in support of his claim [ECF No. 164-13 through 164-17] actually supports a finding that Defendants placement of Plaintiff in the SSNU and Administrative Custody was predicated solely upon Plaintiff's past behavior. As Plaintiff conceded in his initial grievance concerning his housing placement at SCI-Fayette, "My record speaks volumes, there's nothing I could say to justify my problematic past." [ECF No. 164-13]. Plaintiff clearly understood that his placement would have occurred regardless of any alleged retaliation as it served a legitimate penological interest in attempting to discern whether mental illness caused Plaintiff's behavior or whether Plaintiff was sufficiently in control of his actions to permit long term restricted housing to protect staff and other inmates. It cannot reasonably be disputed that Defendants would have made the same decision absent any alleged retaliation for Plaintiff's unspecified grievances. Rauser, 241 F.3d at 334. Given the record evidence, Defendants Burns and Popovich are entitled to the entry of judgment in their favor as a matter of law.

### d. Cell Searches and Property Confiscation

Plaintiff alleges that Defendants retaliated against him by searching his cell and confiscating his property. [ECF No. 165, p. 23]. The first claim is against Defendants Riskus, Griffen and Johnson, and arises out of a cell search that occurred at SCI-Forest on August 3, 2007. The second claim is against Defendants Collins and Leggett and arises out of an alleged failure to return Plaintiff's in-cell property after his transfer back to SCI-Fayette from SCI-Waymart in November 2008.

With regard to the first claim arising out of the cell search at SCI-Forest in August 2007, Plaintiff contends that he lodged a complaint concerning his receipt of forged Misconduct No. 641190 with Defendant Riskus, who, two weeks later, ordered Defendants Griffen and Johnson

to search Plaintiff's cell. [ECF No. 165, p. 10]. While Plaintiff contends the cell search was retaliatory, Plaintiff does not identify any previously filed grievance against Defendants Riskus, Griffen or Johnson. Thus there is no evidence establishing that Plaintiff's exercise of his First Amendment rights (filing grievances) was a substantial motivating factor in the decision by Defendants Riskus, Griffen or Johnson to search his cell. In the absence of this evidence, Plaintiff cannot meet his initial burden of proof to sustain a retaliation claim. Crawford–El v. Britton, 523 U.S. at 600; Rauser, 241 F.3d at 333.

It is also clear that the cell search occurred after Plaintiff challenged a validly issued misconduct based upon the purported issuance of a suspicious, unaccounted for and forged misconduct form. [ECF No. 152-3, 152-11, p.7]. Viewing the evidence as a whole in the light most favorable to Dockery, a reasonable jury could not escape the conclusion that Defendants' search of his cell served a legitimate penological interest to determine whether Plaintiff was in possession of blank misconduct forms in violation of DOC policy. Because Defendants would have made the same decision to search his cell regardless of whether Plaintiff had filed grievances against them, summary judgment in favor of Defendants is proper. See Mincy v. Klem, 277 F. App'x 239, 244 (3d Cir. 2008)(summary judgment properly entered in favor of defendants on plaintiff's retaliation claim arising out of cell search prompted by plaintiff's grievance regarding rocks placed in plaintiff's food, where search was conducted to determine if plaintiff had rocks of any kind in his cell); Tindall v. Beard, 351 F. App'x 591, 595 (3d Cir. 2009)(summary judgment is proper where there is no evidence other than Plaintiff's personal belief that defendants acted with a retaliatory motive and evidence is provided to show that same decision would have been made regardless of pending litigation).

Plaintiff also alleges that the November 2008 failure to return his in-cell property after his transfer back to SCI-Fayette from SCI-Waymart was retaliatory. Plaintiff again fails to link the loss of his in-cell property to any grievance filed against Defendants Collins and Leggett. [ECF No. 165, pp. 22, 29-30] Because Plaintiff fails to make a prima facie showing that constitutionally protected conduct was a substantial or motivating factor in any alleged decision to withhold his property upon his return to SCI-Fayetee, Defendants Collins and Leggett are entitled to the entry of judgment in their favor as a matter of law.

### 2. Plaintiff's Eighth Amendment Claims

### a. Eighth Amendment Excessive Force Claims

Dockery has alleged the violation of his rights under the Eighth Amendment of the United States Constitution arising out of an incident involving the use of force in connection with Plaintiff's refusal to relinquish handcuffs in to protest dissatisfaction with the a search of Plaintiff's cell. [ECF No. 5, ¶ 52]. Plaintiff contends that in using a tether attached to the handcuffs to gain control over his hands, Defendants pulled his hands through a slot on his door, causing deep abrasions and swelling. Id.

The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency. See Hudson v. McMillian, 503 U.S. 1, 8–9 (1992). When reviewing Eighth Amendment excessive force claims, we must determine whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. Whether the force applied was excessive requires the examination of several factors outlined by the United States Supreme Court in Whitley v. Albers, 475 U.S. 312, 321 (1986), including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the

extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

With respect to the first factor -- the need for the application of force – Plaintiff admits that the incident occurred because the he refused to relinquish handcuffs after protesting a cell search.  [ECF No. 164-28, p.2; 152-7, pp. 9-10].   Given his repeated refusal, Defendants used force to gain control of Plaintiff's hands to recover the handcuffs, pulling the tether attached to the handcuffs to position Plaintiff's hands through the cell door feeding aperture.  Id.   As to the second and third factors, the medical records produced indicate that Plaintiff was examined after the incident and that he sustained small superficial abrasions to his left wrist, with no swelling or bruising.  He was instructed to wash his wrist with soap and water.  [ECF No. 152-7, p. 24].  Plaintiff has not produced any evidence to dispute these medical findings.

The United States Court of Appeals for the Third Circuit has affirmed the entry of summary judgment in favor of DOC personnel where a refusal to submit to handcuffing resulted in the use of mace and a taser, finding that the absence of a record of serious injury coupled with the need to gain control over the inmate constituted a good-faith effort to restore discipline.  Banks v. Mozingo, 423 F. App'x 123, 126-127 (3d Cir. 2011); Washam v. Klopotoski, 403 F. App'x 636, 640 (3d Cir. 2010)(no Eighth Amendment violation where use of force, slamming plaintiff to ground and handcuffing him resulted to abrasions to shoulder and knee, indicated *de minimis* force utilized to gain control of inmate).   Dockery likewise presents no evidence of the unnecessary or malicious infliction of pain in violation of the Eighth Amendment as a result of Defendants' efforts to gain control of him to recover the handcuffs.  Considering all the Whitley factors, no reasonable jury could find that the *de minimis* force utilized was "of a sort repugnant

to the conscience of mankind" in violation of the Eighth Amendment. Accordingly, Defendants Bittner, Collins, Dobis and Richter are entitled to the entry of judgment in their favor as a matter of law with regard to Plaintiff's Eighth Amendment excessive force claim.

Dockery also fails to present a genuine issue of material fact with respect to his Eighth Amendment claim of deliberate indifference against Defendant Jennings, who allegedly denied Plaintiff medical treatment after this incident because he would not open the cell door food aperture to permit a nurse to treat his injuries. [ECF No. 165, p. 43; No. 5, ¶ 54]. See Farmer v. Brennan, 511 U.S. 825, 834 (1994)(to prove deliberate indifference, plaintiff must show defendant had a "'sufficiently culpable state of mind'" (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)). It is undisputed that with Defendant Jennings, medical staff visually examined Plaintiff's *de minimis* injuries. Further, it is undisputed that Plaintiff was instructed by the attending nurse to wash his wrist with soap and water. Finally, Plaintiff has presented no evidence that he was incapable of washing his own wrist with soap and water. As such, there is no evidence that Defendant Jennings deliberately interfered with *necessary* medical treatment so as to display a culpable state of mine. Therefore, Defendant Jennings is entitled to the entry of judgment in his favor as a matter of law.

### b. Eighth Amendment Conditions of Confinement

Dockery next claims that the conditions of confinement in the special housing units at SCI-Forest and SCI-Fayette violated his rights under the Eighth Amendment. In particular, Plaintiff alleges that he suffered intolerable noise levels from inmates banging on toilets and cell doors, the stench of urine and feces, and that he was exposed to inmates throwing feces, urine, food, food trays and other objects. [ECF No. 17, ¶¶ 5, ECF No. 5, ¶ 42]. In addition, Plaintiff complains that for certain periods of time he was placed on Behavior Modified Meals, consisting

of a food loaf, and was deprived showers and exercise yard time. In support of his claims, Plaintiff points to his record of grievances, including evidence of a single incident involving an inmate throwing feces at him. [ECF Nos. 164-19, 164-20]. The record of grievances indicates that of the 59 grievances Plaintiff filed for mail issues, problems with staff, property claims, medical co-pays, he filed four grievance related to "hygiene" and two grievances related to "conditions." [ECF No. 164-20]. However, with the exception of Plaintiff's grievance concerning a single incident of another inmate throwing feces, there is no indication as to the substance of Plaintiff's grievances to determine if any relate to the allegations in Plaintiff's Complaint.

Defendants move for summary judgment, arguing that Plaintiff has not provided any evidence sufficient to support an Eighth Amendment conditions of confinement claim. As Defendants contend, in order to succeed in an Eighth Amendment conditions of confinement claim, Plaintiff must demonstrate both that he has been denied "the minimal civilized measure of life's necessities" and that this was done while Defendants had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994). With respect to the first requirement, conditions cited by an inmate must be "objectively, sufficiently serious [and] must result in the denial of the minimal civilized measure of life's necessities." Id. at 834 (internal citation and quotation omitted). Only "extreme deprivations" are sufficient to make out a conditions of confinement claim. Hudson v. McMillen, 503 U.S. 1, 8–9 (1992). A plaintiff must prove that the deprivation is sufficiently serious when viewed within the context of "contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 36 (1993). Although a combination of confinement conditions—considered alone constitutionally insufficient—may present an Eighth Amendment violation, they nevertheless must cumulatively produce "the deprivation of a single, identifiable

human need such as food, warmth, or exercise...." See Wilson v. Seiter, 501 U.S. 294, 304

(1991). In applying this test, the Court acknowledges that "[t]he Constitution ... does not

mandate comfortable prisons." Wilson, 501 U.S. at 298. "In considering whether a prisoner has

been deprived of his rights, courts may consider the length of time that the prisoner must go

without those benefits." Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982) (*citing* Hutto v.

Finney, 437 U.S. 678, 685 (1978)).

    With respect to the second element, an inmate must demonstrate deliberate indifference

to prison conditions on the part of prison officials. Farmer, 511 U.S. at 833; Wilson, 501 U.S. at

297; Rhodes v. Chapman, 452 U.S. 337, 347 (1981). This requires a court to determine,

subjectively, whether the officials acted with a sufficiently culpable state of mind. Id.

> [A] prison official cannot be found liable under the Eighth Amendment for
> denying an inmate humane conditions of confinement unless the official knows of
> and disregards an excessive risk to inmate health or safety; the official must both
> be aware of facts from which the inference could be drawn that a substantial risk
> of serious harm exists, and he must also draw the inference.... The Eighth
> Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and
> unusual "punishments."

Farmer, 511 U.S. at 838. Thus, a prison official may be held liable under the Eighth Amendment

for denying humane conditions of confinement only if he knows that inmates face a substantial

risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. A

trier of fact may infer the existence of this subjective state of mind from the fact that the risk of

harm is obvious. Id. at 842.

    With this standard in mind, this Court turns to Plaintiff's claims that he suffered

violations of his rights under the Eighth Amendment as a result of the conditions in special

housing units. The three categories of Plaintiff's clams include: (1) the alleged unsanitary

conditions of the special housing unit; (2) the denial of outdoor exercise and showers; and (3) his

placement on a Behavior Modified Meal for a period of time. However, with regard to each of the alleged inhumane conditions of his confinement, Plaintiff presents neither evidence of an excessive risk to his health or safety nor evidence that any of the Defendants were subjectively aware of facts from which the inference could reasonably be drawn that Plaintiff's health or safety were at risk.

The lack of evidence is fatal in support of Plaintiff's conditions of confinement claims to these claims as a matter of law, for no reasonable juror could conclude that Plaintiff's rights were violated. First, the Courts are unanimous in holding that the conditions in restrictive housing in Pennsylvania prisons do not, in and of themselves, violate the Eighth Amendment. See Griffin v. Vaughn, 112 F.3d 703 (3d Cir.1997) (holding that the restrictive conditions in administrative custody in the Pennsylvania state correctional institutions, in and of themselves, do not violate the Eighth Amendment); Fortson v. Kelchner, 2009 WL 693247, At *3 (W.D. Pa. Mar. 13, 2009) (granting Defendants' Motion to Dismiss as to Plaintiff's Eighth Amendment claim regarding confinement in the RHU and SMU); Pressley v. Blaine, 544 F. Supp.2d 446, 453 (W.D. Pa. 2008) (holding that the conditions of disciplinary confinement did not implicate the Eighth Amendment); *rev'd on other grounds*, 352 F. App'x 701 (3d Cir. 2009); Dantzler v. Beard, Civil No. 05-1727, 2007 WL 5018184, at *11-12 (W.D. Pa. Dec. 6, 2007) (holding that the conditions of confinement in the SMU and LTSU did not amount to cruel and unusual punishment in violation of the Eighth Amendment); Woods v. Abrams, Civil No. 06-757, 2007 WL 2852525, 14 (W.D. Pa. Sept. 27, 2007) (holding that the conditions of confinement in the LTSU did not satisfy the objective component of an Eighth Amendment claim); Banks v. Beard, Civil No. 03-659, 2006 WL 2192015, at *11 (W.D. Pa. Aug. 1, 2006) (same); Rivera v. Pennsylvania Dept. of Corrections, 837 A.2d 525, 530-532 (Pa. Super. 2003) (same).

Second, Plaintiff fails to adduce evidence concerning the proximity of the conditions to him and the length of time he was exposed to such conditions. "Certainly length of exposure to unsanitary conditions is one consideration in determining the objective prong of the Eighth Amendment." Id. See also Banks v. Beard, No. 03–659, 2006 WL 2192015, 11 (W.D. Pa., Aug. 1, 2006); Whitnack v. Douglas County, 16 F.3d 954, 958 (8th Cir. 1994) ("the intolerable conditions lasted not more than 24 hours before the availability of adequate cleaning supplies would make them tolerable"). The absence of record evidence supporting exposure to any particular unsanitary condition for an inordinate period of time fails to raise conditions that will satisfy the objective component of an Eighth Amendment claim. Compare, Qawi v. Howard, 2000 WL 1010281, *3 (D.Del. July 7, 2000) ("For example, in [Smith v.] Copeland [, 87 F.3d 265, 268 (8th Cir.1996) ], the Eighth Circuit Court of Appeals held that an inmate's confinement in a cell for four days with an overflowing toilet, during which time he was 'made to endure the stench of [his] own feces and urine,' did not rise to the level of an Eighth Amendment violation."); Davis v. Scott, 157 F.3d 1003, 1004 (5th Cir.1998) (inmate being placed in cell that was "just filthy with blood on the walls and excretion on the floors and bread loaf on the floor" for three days did not meet the objective component of the Eighth Amendment) (some internal quotes omitted).

Plaintiff also makes specific complaints about receiving Behavior Modified Meals, but does not provide any evidence concerning any ill health effects suffered as a result of the meals or that he was denied consecutive meals creating an additional risk of harm. Accordingly, there is no evidence that Plaintiff suffered a denial of a basic, identifiable human necessity. See, e.g., Ford v. Brd. of Mgrs of New Jersey State Prison, 407 F.2d 937, 939-940 (3d Cir.1969) (no Eighth Amendment claim where prisoner fed four slices of bread and one pint of water three

times a day with a full meal every three days); Adams v. Kincheloe, 743 F.Supp. 1385, 1391 (E.D.Wash.1990) (placing inmate on disciplinary five-day diet of "nutra-loaf" did not violate the Eighth Amendment especially since inmate did not suffer from any weight loss or medical conditions); Briggs v. Heidlebaugh, Civil No. 96-3884, 1997 WL 318081 *3 (E.D. Pa. May 22, 1997) (feeding inmate nothing but bread and cheese for seventy-two hours did not support an Eighth Amendment violation); Rivera v. Pennsylvania Dept. of Corrections, 837 A.2d 525, 530-532 (Pa. Super. 2003) (method of using food loaf as behavior modification does not violate the Eighth Amendment).

Plaintiff further claims that he was subjected to infrequent showers in restrictive custody. The Eighth Amendment does not require that inmates receive frequent showers. DiFilippo v. Vaughn, Civil No. 95-909, 1996 WL 355336 at *5 (E.D.Pa. June 24, 1996) (holding that the Eighth Amendment does not require that prisoners be afforded frequent or comfortable showers). Likewise, the Eighth Amendment does not require hot showers. See Lopez v. Robinson, 914 F.2d 486, 492 (4th Cir.1990). Plaintiff's claim of infrequent showers, without more, does not state a claim under the Eighth Amendment. See Davenport v. DeRobertis, 844 F.2d 1310, 1316 (7th Cir.) (holding that one shower a week constitutionally sufficient), cert. denied, 488 U.S. 908 (1988); Veteto v. Miller, 829 F. Supp. 1486, 1496 (M.D. Pa.1992) (holding that deprivation of showers during period of placement in administrative detention did not violate the Eighth Amendment); Devon v. Warden SCI-Mahanoy, Civil No. 08-1448, 2008 WL 3890161, 4 (M.D. Pa. Aug. 19, 2008) (holding that thirteen days without shower, shave or recreation did not violate the Eighth Amendment); Briggs v. Heidlebaugh, Civil No. 96-3884, 1997 WL 318081 *3 (E.D. Pa. May 22, 1997) (holding that suspension of shower privileges for two weeks did not violate the Eighth Amendment).

Plaintiff next claims that he was denied a meaningful opportunity to exercise. Although the Constitution does not require out-of-cell exercise, the near-total deprivation of the opportunity to exercise may violate the Eighth Amendment unless the restriction relates to a legitimate penological purpose. However, lack of exercise can only rise to this level "[w]here movement is denied and muscles are allowed to atrophy, [and] the health of the individual is threatened...." French v. Owens, 777 F.2d 1250, 1255 (7th Cir.1985), cert. denied, 479 U.S. 817, (1986). Plaintiff presents no evidence of either condition, nor does he present any evidence at all concerning the length of the alleged deprivation. Further, deprivation orders and restraining orders which limit a prisoner's recreation to one hour at a do not violate a prisoner's Eighth Amendment rights when the denial of recreation is in response to disciplinary problems created by the plaintiff. See Wilson v. Shannon, 982 F.Supp. 337, 341 (E.D.Pa.1997) (granting summary judgment against plaintiff prisoner's Eighth Amendment claim based on a denial of exercise, holding there was no deliberate indifference where "[plaintiff] was denied exercise for only a brief period of time and denial of exercise was in response to disciplinary problems created by the plaintiff).

Finally, the record essentially is silent as to whether any of the Defendants knew about the allegedly inhumane conditions of Plaintiff's housing unit, or if they did, when they were made aware of it and how long thereafter the conditions were permitted to exist. Thus, Plaintiff has failed to support a finding on the subjective prong of the Eighth Amendment with regard to his conditions of confinement claim. Consequently, given the dearth of evidence, Defendants are entitled to summary judgment as a matter of law with regard to Plaintiff's Eighth Amendment conditions of confinement claims.

### 3. Plaintiff's Due Process Claims

Dockery claims that his rights were violated because he was not afforded the process he was due under the Fourteenth Amendment Due Process Clause with regard to his placement in special housing units, the confiscation of his property, the assessments on his inmate account for medical treatment he received, the repair and replacement of his typewriter, and the medical bills for the treatment received by Defendant Vojacek after Plaintiff assaulted him with feces and urine. The record evidence, however, makes clear that as a matter of law, Plaintiff was provided the process he was entitled to with regard to each claim.

### a. Plaintiff's Liberty Interest With Regard to Housing Placement

Plaintiff alleges that Defendants' actions in placing him in the SHU and SSNU violated his rights under the Due Process Clause of the Fourteenth Amendment because DOC procedures were not strictly followed with regard to providing him with a DC-141 Part IV form, and because the decision to place him in Administrative Custody at SCI-Fayette was based upon his past history of assaults, rather than his contemporaneous behavior. [ECF No. 165, pp. 11-18]. Because, under the facts of this case, neither claim implicates a protected liberty interest, Plaintiff's procedural due process claim fails as a matter of law.

The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner. Meachum v. Fano, 427 U.S. 215, 224 (1976). The Due Process Clause shields from arbitrary or capricious deprivation only those facets of a convicted criminal's existence that qualify as "liberty interests." Hewitt v. Helms, 459 U.S. 460 (1983); Morrissey v. Brewer, 408 U.S. 471 (1972). The types of protected liberty interests are not unlimited. The interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope. Rather, an individual claiming a protected interest must have a

legitimate claim of entitlement to it. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (citation omitted).

Thus, the threshold question presented by Plaintiff's claim is whether Defendants' actions impacted a constitutionally-protected liberty interest. A liberty interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation. Hewitt, 459 U.S. at 466.

A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom such that the loss of liberty entailed by its revocation is a serious deprivation requiring that the prisoner be accorded due process. Gagnon v. Scarpelli, 411 U.S. 778, 781 (1973). Interests recognized by the Supreme Court that fall within this category include the revocation of parole, Morrissey, 408 U.S. at 471, and the revocation of probation, Gagnon, 411 U.S. at 778. The Due Process Clause, however, does not create an inherent liberty interest to remain free from administrative segregation. See, e.g., Hewitt, 459 U.S. at 468; Wolff, 418 U.S. at 556; Montayne v. Haymes, 427 U.S. 236, 242 (1976); Sheehan v. Beyer, 51 F.3d 1170, 1175 (3d Cir. 1995); Layton v. Beyer, 953 F.2d 839, 845 (3d Cir. 1992). Accordingly, Plaintiff can succeed under the Due Process Clause only if state law or regulation has created a constitutionally-protected liberty interest in remaining free from administrative detention.

In Sandin v. Conner, 515 U.S. 472 (1995), the United States Supreme Court dramatically narrowed the range of liberty interests created by law and regulation. Prior to Sandin, courts reviewed the specific language of the pertinent law or regulation to determine whether the language was unmistakably mandatory in character such that it created a liberty interest. The Supreme Court announced a new rule in Sandin for determining whether a prisoner had a protected liberty interest created under statute or regulation by shifting the focus of inquiry from

the specific language of the law or regulation to whether the deprivation suffered by the prisoner imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 483 (emphasis added).

Every court that has addressed this issue in Pennsylvania has determined that prisoners do not have a liberty interest in remaining free from confinement in the SMU or similar housing. See, e.g., Smith v. Dodrill, 2009 WL 62175 (M.D. Pa. Jan. 8, 2009); Spencer v. Kelchner, 2007 WL 88084 (M.D.Pa. Jan. 9, 2007); Dantzler v. Beard, 2007 WL 5018184 (W.D. Pa. Dec. 6, 2007); Francis v. Dodrill, 2005 WL 2216582 (M.D. Pa. Sept. 12, 2005). Cf. Johnson v. Hill, 910 F.Supp. 218, 220 (E.D. Pa.1996) (holding that, absent a state-created liberty interest that does not exist in Pennsylvania, prisoner placement is a matter of prison administration and a prisoner has no constitutional right to be placed in any particular cell or housing unit).

Notwithstanding, long-term confinement in restricted housing may be sufficiently atypical and significant to create a protected liberty interest. See Shoats v. Horn, 213 F.3d 140 (3d Cir. 2000). Here, the Court has determined that Plaintiff was confined to restricted housing at SCI-Fayette for approximately one year before his transfer to SSNU, where he apparently remained until November 2011, when he was transferred over his strenuous objection to Administrative and/or Disciplinary Custody because of continued behavioral issues and assaults.[10]

For purposes of the current motions before the Court, it is assumed that Plaintiff has demonstrated a protected liberty interest based on the length of his special housing assignment.

---

[10] Plaintiff was notified of his placement in Administrative Custody on November 20, 2007, and was subsequently notified of his transfer to SSNU on November 6, 2008.   [ECF No. 152-5].  As of November 17, 2011, he was removed from the SSNU because of his continued "disruptive behavior [which] affects the progress of other inmates in the program."  [ECF No. 164-18].  However, the Court takes judicial notice of the record in a subsequently filed prisoner civil rights suit, Dockery v. Wentzel, No. 11-1368  (M.D. Pa), where Plaintiff alleges that as of April 24, 2012, he remained housed in Disciplinary Custody due to additional assault allegations [No. 11-368, ECF No. 32, p. 2].

However, it is well settled in Pennsylvania that periodic review of inmates indefinitely confined in administrative confinement comports with due process requirements and as such, based upon the record evidence, Plaintiff's due process claim cannot be sustained. Shoats 213 F.3d at 144; Delker v. McCullough, 103 F. App'x 694 (3d Cir. 2004); McKeithan v. Beard, 322 F. App'x 194, 199 (3d Cir. 2009) (holding that prisoner's due process claim failed because he received periodic reviews while in the LTSU); Brown v. Pa. Dep't of Corrections, 290 F. App'x 463, 465-66 (3d Cir. 2008) (same); Dantzler v. Beard, Civ. No. 05-1727, 2008 WL 744740, at *1 (W.D. Pa. Mar. 18, 2008) (same for LTSU and SMU). The Court of Appeals for the Third Circuit repeatedly has affirmed the holding in Shoats that post-transfer periodic review comports with due process requirements for prisoners serving lengthy sentences who are housed in restrictive administrative custody for indefinite periods of time. See, e.g., Gans v. Rozum, 267 F. App'x 178, 180-81 (3d Cir. 2008) (prisoner in administrative custody status for eleven years); Williams v. Sebek, 299 F. App'x 104, 107 (3d Cir. 2008) (holding that inmate's continued confinement in administrative custody for five and one-half years did not require a remedy because the record showed that he was receiving the required periodic reviews of his status by the program review committee); Brown v. D.O.C. Pa., 265 F. App'x 107, 110 (3d Cir. 2008) (same); Bowen v. Ryan, 248 F. App'x 302, 304 (3d Cir. 2007) (prisoner in administrative custody status for twenty years on restricted release status).

Here, the record establishes that Dockery was informed of the reasons for his assignment to Administrative Custody status in writing no later than November 2, 2007, at 1:00 p.m. and November 20, 2007, at 8:00 p.m., and in person on November 21, 2007.   [ECF No. 152-5, p.2; 152-13].   Plaintiff filed his first grievance via an "Inmate's Request to Staff Member" on November 26, 2007, indicating his belief that his "problematic past" was likely the reason for his

housing assignment. [ECF No. 164-13]. He refused to attend his next review hearing on February 14, 2008, and was advised on June 26, 2008, that he was to remain in Administrative Custody pursuant to policy because it was determined that he presented a danger to himself or others. [ECF No. 152-5, pp. 6-7]. On this record, Plaintiff was provided adequate notice of the reasons for his transfer and retention in special housing. The record also supports a finding of that the post-transfer periodic review of Plaintiff's placement in segregation provided him with "a meaningful opportunity to challenge the grounds of his continued segregation." Brown, 290 F. App'x at 465. Accordingly, Defendants are entitled to summary judgment as to Plaintiff's due process claim based upon lack of notice and procedural fairness.

Plaintiff also raises a due process challenge to his housing assignment because it was predicated, in part, upon his past behavior. However, the United States Court of Appeals for the Third Circuit has repeatedly found that due process is not violated by placing an inmate in administrative custody based on past conduct when that conduct provides a basis for predicting that the inmate will present a danger if corrective measures are not taken. See Fraise v. Terhune, 283 F.3d 506, 523 (3d Cir. 2002); Crawford v. Lappin, 446 F. App'x 413, 415 (3d Cir. 2011). Given the Plaintiff's acknowledgment of his "problematic past" which includes over eighty-five misconducts for various offenses including repeated assaults of prison staff, it is certainly within the purview of prison officials to consider the safety of the prison population as a whole in determining Plaintiff's housing assignment. Pressley v. Pennsylvania Dept. of Corr., 365 F. App'x 329, 331 (3d Cir. 2010). Accordingly, Plaintiff's due process claim on this basis fails as a matter of law.

**b. Alleged Deprivation of Property**

Plaintiff contends the loss or confiscation of his in-cell property violated his due process rights because he was not afforded a post-deprivation remedy. [ECF No. 165, p. 30]. However, a Section 1983 civil rights claim cannot be brought to vindicate a prisoner's right to property when the deprivation occurs as a result of either an alleged tortious or unauthorized act and where an adequate remedy exists to compensate those who have suffered tortious loss at the hands of the state. Parratt v. Taylor, 451 U.S. 527, 543–44 (1981). The United States Supreme Court has extended Parratt to include intentional deprivations of property, holding that where a prisoner has an adequate post-deprivation remedy under state law for any loss suffered to his property, a civil rights claim is not available. Hudson v. Palmer, 468 U.S. 517, 532–33 (1984). The federal courts in Pennsylvania have recognized that both the DOC internal grievance procedure and the availability of a state tort suit in state court provide adequate post-deprivation remedies so as to satisfy due process requirements under Hudson. See, e.g., Edmonds v. Sobina, 295 F. App'x, 214, 217 n. 5 (3d Cir. 2008); Austin v. Lehman, 893 F. Supp. 448, 454 (E.D. Pa.1995); Payton v. Horn, 49 F. Supp.2d 791, 795 (E.D.Pa.1999). Consequently, regardless of whether the deprivation of property in the instant case was the result of intentional or negligent conduct, Dockery may not obtain relief via a civil rights complaint if he has adequate alternative remedies.

Upon his return to SCI-Fayette in November 2008, Dockery participated in the grievance process and was notified that his in-cell property was located and placed with the remainder of his property in the "RHU property room." [ECF No. 164-25, p. 12]. Dockery contests the findings of the reviewing officials, and contends that the DOC grievance process is insufficient because it did not result in the return of his in-cell property. However, his claim for loss of

property was amenable to suit in Pennsylvania state court to obtain compensation for items proved to be lost as a result of DOC actions. Since this remedy was available to him, Defendants are entitled to the entry of judgment in their favor as a matter of law.[11]

### c. Typewriter Shipping and Medical Co-Pay Charges

Plaintiff challenges the charges to his inmate account for both the shipping related to the repair/replacement of his typewriter and the medical co-pay charges related to a hunger strike. He contends both charges were improper and therefore he has suffered the deprivation of his property in violation of his procedural due process rights. [ECF No. 165, pp. 39-43]. Inmates have a protected property interest in the funds in their prison accounts. Reynolds v. Wagner, 128 F.3d 166, 179 (3d Cir. 1997). Accordingly, "inmates are entitled to due process with respect to any deprivation of money [from their accounts]." Higgins v. Beyer, 293 F.3d 683, 693 (3d Cir. 2002) (citations omitted).

In Reynolds, the Court of Appeals for the Third Circuit upheld the constitutionality of a county prison policy, which assessed small co-payments for medical care. Reynolds, 128 F.3d 166. The inmate handbook explained certain exceptions to the medical co-pay requirement. An inmate who disagreed with a fee assessment, could file a grievance on the matter. In finding no violation of the Due Process Clause, the Court noted: "Moreover, this is not a situation in which the inmates are deprived of the benefits of their property and receive nothing in return; rather in exchange for the fees, the inmates receive the benefit of health care, the value of which undoubtedly exceeds the modest fee assessed." Id. at 180.

---

[11] Further, while Plaintiff attempts to make out a claim that the loss of his property destroyed his ability to challenge his underlying conviction and to set forth additional claims herein, the record evidence belies the credibility of his claim to such a degree that no reasonable juror could conclude that he suffered an injury for which compensation is insufficient. See, pps. 15-16, *supra*.

Similarly, in <u>Tillman v. Lebanon County Correctional Facility</u>, 221 F.3d 410, 422 (3d Cir. 2000), the plaintiff also challenged the adequacy of procedural safeguards in place when the prison only provided the opportunity for a post-deprivation hearing with regard to administrative assessments. In that case, the Court of Appeals for the Third Circuit stated that the procedures afforded by the prison satisfied the constitutional requirements of due process. Specifically, the Court stated that,

> It is impractical to expect the prison to provide predeprivation proceedings under these circumstances.... The assessments and takings pursuant to the program involve routine matters of accounting, with a low risk of error. To the extent that mistakes such as erroneous assessments or incorrect takings might occur, they may be corrected through the prison's grievance program without any undue burden on a prisoner's rights. On the other hand, to require predeprivation proceedings for what are essentially ministerial matters would significantly increase transaction costs and essentially frustrate an important purpose of the program, which is to reduce the county's costs of incarcerating prisoners.

<u>Id.</u> at 422.

Here, Plaintiff also was provided with an adequate post-deprivation remedy to challenge both the $10.00 medical co-pay and the charge for shipping his typewriter for repairs. With regard to the medical co-pay, Plaintiff received notice of the charge on March 4, 2009, and filed a grievance, citing to DC-ADM 820, Section 2, in support of his contention that in the absence of his specific authorization, or upon his refusal to sign an authorization, debiting his account for the services provided as a result of his hunger strike deprived him of due process. [ECF No. 152-18, p. 7, 164-32]. In response to his grievance, Plaintiff was informed that the fee was appropriate pursuant to policy, because the medical observation or treatment resulted from self-inflicted harm. [ECF No. 152-18]. Accordingly, Plaintiff was provided an opportunity to challenge the fee, determine if the charge was in error and seek correction. These procedural safeguards constitute adequate pre- and post-deprivation procedures sufficient to protect

Plaintiff's due process rights under the DOC co-pay program. McKeithan v. Beard, 2010 WL 2028091 *6 (No. 06-965) (W.D. Pa. April 12, 2010).

With regard to Plaintiff's claim that the typewriter shipping charge for postage was in error, Plaintiff was provided pre-deprivation notice of the charge and a post-deprivation grievance process to challenge the charge. First, Plaintiff signed a cash slip authorizing the charge for the shipment of his typewriter for repair. [ECF No. 152-22]. Plaintiff contested the charge through the DOC grievance process after learning that the manufacturer replaced the typewriter and he believed the shipping charge was improper. [ECF No. 152-22, p. 3]. Plaintiff was provided documentation and an explanation supporting the charge from his account. Thus a meaningful post-deprivation remedy was available to redress his claim that money was wrongfully deducted from his account. In addition, Plaintiff had a state tort remedy available to him for the alleged wrongful deduction of shipping charges. See, e.g., Atwell v. Lavan, 557 F. Supp.2d 532 (M.D. Pa. 2008)(due process requirements met where grievance procedure and state tort claim are available and provide meaningful post-deprivation remedy). Accordingly, Defendants Tony and Burns are entitled to the entry of judgment in their favor as a matter of law as to the medical co-pay and typewriter shipping charge claims asserted against them.

### d. Assessment of Charges for Medical Treatment of Assault Victim

Plaintiff asserts a due process claim with regard to an assessment against him for medical expenses incurred on behalf of Defendant Vojacek, a corrections officer at SCI-Fayette, arising out of an assault by Plaintiff with fecal matter, urine and waste water. [ECF No. 5, ¶¶ 56-58]. Plaintiff alleges that on December 30, 2008, he advised Defendant Vojacek that his cell toilet was leaking. While Plaintiff challenges the facts regarding all remaining aspects of the incident, the record reflects an administrative finding that after ordering Plaintiff not to flush the toilet,

Defendant Vojacek attempted to stop the flow of water by clearing a pipe chase. [ECF No. 152-16, p. 3]. Plaintiff disobeyed the order, flushing the toilet and sending waste water, fecal debris and urine into Defendant Vojacek's face and eyes. Defendant Vojacek obtained outside medical treatment at Uniontown Hospital at a cost of $620. [ECF Nos. 152-19; 164-30]. Plaintiff received Misconduct No. 735756 for refusing to obey an order, which he challenged at a hearing first, by claiming it was served the day after the incident and so was late and, second, that he either did not hear the order or it was never provided to him. In addition, Plaintiff contends Defendant Vojacek fabricated the misconduct and medical treatment, impairing his property rights without the procedural protection required by the Due Process Clause. [ECF No. 165, p. 38].

Plaintiff supports his allegation that the incident was fabricated through evidence that a second misconduct was issued the day after the incident, prepared by Defendant Vojacek's supervisor and indicating that Defendat Vojacek's treatment resulted in verified medical expenses in the amount of $620. Because this second misconduct was dismissed without prejudice, Plaintiff contends the incident was fabricated. Instead, it is plainly obvious and beyond rational dispute that the second misconduct was dismissed because Plaintiff had been sanctioned for the incident via Misconduct No. 735756, and assessed the cost of medical treatment incurred by Defendant Vojacek, rendering the second misconduct duplicative. [ECF Nos. 152-16, p. 3 and 164-30, p.14].

Plaintiff also appealed the Hearing Examiner's finding of guilt because he was never provided proof of the amount of medical expenses and/or treatment, and therefore alleges a violation of his rights to due process. As previously indicated, the Third Circuit Court of Appeals has recognized that inmates have a property interest in funds held in their prison

accounts. <u>Burns v. PA Dep't of Corr.</u>, 544 F.3d 279, 285-286 (3d Cir. 2008) (*citing* <u>Reynolds v. Wagner</u>, 128 F.3d 166, 179 (3d Cir. 1997)). Thus, they are entitled to due process when prison authorities place an encumbrance on the inmate's account, even though no deduction or seizure has yet taken place. <u>Id.</u> at 291. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, or property' is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." <u>Zinermon v. Burch</u>, 494 U.S. 113, 125 (1990). Here, Plaintiff has properly alleged the first prong of this due process analysis, the encumbrance on his account and thus the only question presented is whether his prison account was assessed without adequate procedural safeguards. <u>See McKeithan v. Beard</u>, 322 F. App'x 194, 198 (3d Cir. 2009).

In <u>Burns II</u>, *supra*, the Court of Appeals for the Third Circuit held that before an inmate's account is charged for medical expenses incurred as the result of a finding of guilt for an assault, the inmate is entitled to pre-deprivation notice and hearing. <u>Burns</u>, *supra*, at 171-172. Here, Dockery was afforded a pre-deprivation disciplinary hearing, and was permitted to present evidence challenging his guilt. [ECF No. 152-16]. The primary basis of Plaintiff's challenge lay in a credibility determination (he claimed he did not hear the order not to flush his toilet while it was being repaired). Based on the evidence presented, it was within the purview of the Hearing Examiner to assess the credibility of the parties and determine the Plaintiff's guilt for the incident based upon his claims that he did not hear the direct order not to flush the toilet.

However, Plaintiff also appealed the imposition of medical expenses in the absence of evidence of medical treatment. [ECF No. 152-16, p. 6]. This challenge, which goes to the *amount* of expenses imposed and not to Plaintiff's *guilt* for the incident, is appropriate. Under Pennsylvania law, the failure to provide an opportunity "to protest the *amount* of money to be

deducted from the prisoner's account" constitutes a denial of an inmate's procedural due process rights. Burns, *supra*, at 178, *citing* Holloway v. Lehman, 671 A.2d 1179 (Pa. Commw. 1996). Inmates are to be afforded a "Holloway hearing" to determine the amount of money to be deducted from an account and are permitted to challenge the amount based upon the evidence presented. Id. This hearing is not required to take occur simultaneously with the misconduct hearing determining guilt, but is required to occur prior to the imposition of an assessment on the inmate's account. Based on the record before the Court, such a hearing did not take place and Plaintiff's due process rights with regard to the ability to challenge evidence of the *amount* of the assessment have been violated.

The remedy for the deprivation of Plaintiff's right to contest the amount, however, is straightforward and, as a matter of law, does not entitle Plaintiff to the relief he seeks (compensatory and punitive damages). As the Burns II Court held, once a due process violation is shown to exist, Plaintiff is not entitled to damages absent causation; i.e., if the outcome would have been the same had Plaintiff been afforded the procedural protections that are due, no remedy is due:

> Under Carey[v. Piphus, 435 U.S. 247, 260 (1978)], the plaintiff in a § 1983 case must prove that a constitutional violation has occurred, and that it was the proximate cause of his or her injuries. Once the plaintiff clears both hurdles, the burden shifts to the defendant, who then has an opportunity to prove that the same actions would have occurred even if due process had been provided.… For those actions the prison officials can establish would have been taken regardless of the flawed hearing, the plaintiff is entitled to no remedy, as any remedy would constitute a windfall.

Burns II, *supra*, at 181. Thus, because the assessment of the full cost of medical expenses is mandatory under Pennsylvania law against an inmate found guilty of assault (37 Pa. Code. § 93.12(c4)), there is no genuine factual dispute regarding whether the outcome here would have

been different had Plaintiff been provided a copy of Defendant Vojacek's verified hospital bill. The record establishes beyond dispute that Defendant Vojacek was treated at Uniontown Hospital immediately after the incident at issue. [ECF No. 152-19, p.2]. While Plaintiff should have been provided evidence of the cost of treatment, the outcome would not have changed given Pennsylvania's regulatory scheme imposing strict liability for the *amount* of damages assessed. Pursuant to Burns II, because the outcome would not have been different, Plaintiff is not entitled to relief as a matter of law.

### D.  CONCLUSION

For the foregoing reasons, is respectfully recommended that the Defendants' Motion for Summary Judgment [ECF No. 152] be granted and that Plaintiff's Motions for Summary Judgment [ECF No. 147 and 164] be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193

n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections

within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.


Respectfully submitted,


/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE


Dated: May 22, 2012


cc:     The Honorable Terrence  F. McVerry
        United States District Judge
        All counsel of record by Notice of Electronic Filing


        Timothy Dockery
        BK-8487
        SCI Frackville
        Frackville, PA 17931